Filed 12/17/21  In re D.Y. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.Y., a Person Coming Under the Juvenile Court Law. | B310206 (Los Angeles County Super. Ct. No. 20CCJP05478A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>H.L. and H.Y.,<br><br>        Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County.  Julie Fox Blackshaw, Judge.  Jurisdictional order affirmed and remaining appeal dismissed.

Annie Greenleaf, under appointment by the Court of Appeal, for Defendant and Appellant H.L.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant H.Y.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court found H.L. (mother) and H.Y. (father) responsible for their infant son D.Y.'s (son) repeated and unexplained bruising.  Consequently, the juvenile court exercised its dependency jurisdiction over son under Welfare and Institutions Code section 300, subdivisions (a) and (b).[1]  The juvenile court removed son from his parents' custody and, among other things, ordered mother and father to participate in a parenting course.

On appeal, mother and father challenge the juvenile court's jurisdictional finding under subdivision (a) of section 300. Although mother and father do not challenge the juvenile court's jurisdictional finding under subdivision (b) of section 300—and, thus, dependency jurisdiction remains regardless of our decision here—we consider the parents' appeals because of the ramifications of the court's true finding under subdivision (a). Mother and father also appealed the juvenile court's dispositional orders.  However, subsequent proceedings in the juvenile court have rendered those issues moot, and we do not address them here.

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

As discussed below, we conclude substantial evidence supports the juvenile court's jurisdictional finding under section 300, subdivision (a). Thus, we affirm.

**BACKGROUND**

## 1. Events Preceding Petition

Son is mother and father's only child. Mother and father are son's only caregivers, with mother being the primary caregiver. Mother and father were born in China and have lived in the United States for a number of years. They both speak Mandarin and were assisted by Mandarin language interpreters during the dependency proceedings below.

### a. *Son's September 2020 Hospitalization*

In September 2020, when son was five weeks old, mother noticed swelling and redness on his left ear. At first, mother thought an insect had bitten son's ear. However, because the mark became progressively worse over the course of a few days, mother brought son to an emergency room. The "ER Physician Note" from that visit indicates son was diagnosed with left ear edema and mother was advised "to try conservative measures such as ice first before follow-up with scheduled appointment with pediatrician."

Two days later, mother brought son to see his pediatrician, Dr. Eva Chan. Dr. Chan diagnosed son with hemangioma and a heart murmur. She explained the hemangioma would disappear within five to seven years.[2] However, because the lesion was on

---

[2] At the adjudication hearing, expert witnesses explained the difference between a hemangioma and a hematoma, which distinction is central to this case. According to the Department's expert, a "hemangioma is a benign noncancerous tumor. It's a result of proliferation of blood vessels." The expert further

son's ear and was growing fast, Dr. Chan referred son to a pediatric dermatologist. (Dr. Chan also referred son to a pediatric cardiologist for his heart murmur.) Mother stated Dr. Chan told her if she did not want to wait for her insurance company to process the medical referrals, mother could take son to Children's Hospital Los Angeles (hospital) for assessment right away. Mother decided to take son to the hospital later that same day.

Hospital records indicate son was admitted "with bruising along the [left] ear and along the [left] axilla/proximal upper arm" (i.e., the armpit area). Because there was "no mechanism to explain the bruising," son was admitted to the hospital for a nonaccidental trauma workup. Mother stayed with son at the hospital for five days. Hospital notes indicate a consultation was ordered with both "hematology to rule out bleeding disorders" and "ENT for the ear hematoma," which it was noted "likely will

_____

explained, "Hemangiomas are very different than hematomas" in that hemangiomas "have a very predictable course. . . . [T]hey tend to proliferate, meaning get bigger, usually within the first three months. Then they will go through a period of either no further growth or very slow growth. It's usually around nine to twelve months, maybe a little longer. Then they start to inviolate, meaning they start to go away. They can take years before they completely go away." In contrast, the expert stated a hematoma "is a collection of blood or a blood clot from injury to the [t]issue." A hematoma "heals, resolves. The blood reabsorbs." Significant deep tissue hematomas could take weeks to resolve.

Similarly, the defense expert testified, "a hemangioma is . . . a natural occurring event . . . a disease process, a diagnostic condition, whereas a hematoma is pretty much a traumatic event. And in that situation, trauma has to be determined to be either accidental or non-accidental."

4

need to be evacuated in the OR." Son was also referred to ophthalmology to rule out a retinal hemorrhage, cardiology because of his heart murmur, as well as pediatric surgery. Son had "an extensive hematologic workup that was negative, and imaging that was indeterminate for a vascular malformation versus hematoma." The swelling and discoloration of son's left ear "significantly decreased" during his stay at the hospital.

When son was discharged a few days later, mother and father were instructed to make follow-up appointments with the dermatology clinic, pediatric surgery, and ENT-Otolaryngology, as well as to return to Dr. Chan for son's next scheduled appointment. Son's diagnosis at discharge was "Left ear hemangioma, unconjugated hyperbilirubinemia [jaundice], bilateral axillary [armpit] nodes."

On October 6, 2020, mother brought son for his next routine appointment with Dr. Chan, during which son received scheduled vaccinations and Dr. Chan performed a physical examination of son. Dr. Chan did not observe any new bruises or injuries on son's body. She noted son had been seen at the hospital and was "evaluated for the Hemangioma, according to mom, Ultrasound and MRI of the head showed normal results with no abnormalities and was advised to observe with no intervention."

### b. *Son's October 2020 Hospitalization*

A few days later, on October 9, 2020, mother brought son for his follow-up visit with the hospital's dermatology clinic. The doctor noted "the lesion [on son's ear] improved and continues to decrease in size and there is a small firm nodule suggestive of a resolving auricular hematoma." Also during that appointment, however, an unexplained bruise was seen "spanning his left

5

lateral abdominal wall." As a result, the doctor referred son back to the hospital, where he was admitted and stayed for two days.

Mother stated she had seen a bruise on son's torso the day before when she was changing his diaper. She did not know why son had a bruise but speculated maybe it was because she had held him tightly while bathing him. Mother told a hospital social worker that, the day before, son had a "regular bath" and she did not see bruising at that time but perhaps she had held him "too hard." Father indicated he had not seen bruising on son's chest and believed such bruising must have occurred at the hospital. However, father had seen a bruise on son's ear and guessed it might have happened if mother had held son too tightly while bathing him. Father said neither he nor mother harmed son. He felt no one was "telling him and the mother what is going on with the child." After researching on-line, father believed son might have a blood disease.

Nurses at the hospital reported mother was appropriate with son during his hospitalization.

The hospital medical team conducted a number of tests to determine a potential cause or causes for son's bruising. In addition to a general examination, a pediatric surgeon and an ophthalmology resident doctor examined son. He also underwent both an "x-ray skeletal survey" and CT brain scan. Medical issues were ruled out as the cause of son's injuries. Hospital notes stated, "No medical etiology could be identified to explain [son's] diagnosis." According to a hospital child abuse team, son's bruising was consistent with child abuse.

The attending pediatric emergency medicine physician, Dr. Jeffrey Birnbaum, indicated "strong opposition to [son] being discharged" from the hospital. Dr. Birnbaum noted his concerns

included the fact "that this is [son's] second presentation for traumatic injury with unclear mechanism. Mother did not seek care for bruising today, it was noted at a follow-up appointment with dermatology." Dr. Birnbaum also noted that, during son's first hospital stay, son had an "extensive workup" that was "unremarkable" and "negative." As a result, Dr. Birnbaum felt hematologic abnormality was unlikely and suspected nonaccidental trauma. He noted that although previously there "[w]as concern over a vascular malformation of ear but now with findings on abdomen, less likely." Hospital notes also indicated son's "left ear remains fuller than his right ear but the hematoma is largely resolved."

A hospital social worker referred the case to the Los Angeles County Department of Children and Family Services (Department). Soon after the referral was made, a Department social worker spoke with hospital staff as well as with mother and father. The social worker determined it was in son's best interest to be detained and placed in foster care. Mother and father consented and asked that son be placed with Asian Pacific, preferably Chinese, caregivers. The Department detained son and placed him in foster care.

The Department reported potential child abuse of son to the Los Angeles County Sheriff's Department. A sheriff's deputy responded to the hospital and interviewed Dr. Birnbaum and mother. Dr. Birnbaum told the deputy "several medical tests had been conducted on the child and [the doctor] found no evidence of trauma. However, he along with medical staff were concerned about possible abuse to the child as this was the second time treating the child in the past two weeks for the same [type] of injury." Mother told the deputy she had brought son to the

hospital for a follow-up dermatology appointment related to his ear. She said she informed the doctor of the bruises on son's torso. Mother was concerned son may have a blood disease and she wanted him to undergo medical tests. She further explained she "was sure" the bruising to son's torso occurred the day before when she was bathing son and he slipped into the tub causing mother to grip him tightly with both hands. Mother told the deputy "she was upset with medical staff for their accusations of abuse on her child. She further stated she came to the hospital for help regarding the bruising and was in disbelief the medical staff made accusations of abuse when she was the one who brought the bruises to their attention."

The deputy reported he saw three bruises on son's left torso area, which "were consistent with [mother's] explanation on how her son received them." The deputy was unable to determine if a crime had occurred and recommended "follow-up to determine if any form of child abuse is occurring."

## 2. Petition

On October 14, 2020, the Department filed a three-count section 300 petition on behalf of son (petition). The petition alleged one count under section 300, subdivision (a) and two counts under subdivision (b). The subdivision (a) count was identical to the first subdivision (b) count, which alleged son was at risk of serious physical harm because of bruising and swelling on his body that was "consistent with non-accidental trauma." Those counts alleged mother's explanations for how son sustained his injuries were not consistent with the injuries and father provided no explanation for the injuries. The remaining subdivision (b) count alleged son was at risk of serious physical harm because parents "failed to obtain timely necessary medical

treatment" for son's injuries. The petition noted the Department would be relying on section 355.1, subdivision (a) "to assert that a rebuttable presumption exists finding that the minor is a person described by" subdivisions (a) and (b) of section 300.

At the detention hearing held a few days later, the juvenile court noted it was "sympathetic to the parents; however, this is a very low burden. Based on the severity of the bruises, further investigation needs to take place; but in light of the allegation, pursuant to [section] 355.1 (a) the rebuttable presumption, the court finds that there is a prima facie case for detaining the child and showing the child is a person described by [section] 300." The court ordered son detained from parents and placed in foster care. Parents were granted monitored visitation with son. The court also ordered the Department to have son tested for hemangioma.

### 3.    Further Investigation

The Department continued its investigation and, in late November 2020, filed its jurisdiction and disposition report with the court. The report indicated that, in mid-November 2020, a Department social worker spoke with son's foster parent, who reported son was doing well. The foster parent took photographs of son before and after his monitored visits with mother and father and no new bruising or marks had appeared. On one occasion, however, mother stated she observed a bruise on son's left abdomen during a monitored visit. She showed a photograph of the bruise to a Department social worker, who reported seeing "a bluish color bruise to the left abdomen area on the picture." Foster parent's photographs of son taken prior to the monitored visit that same day, however, showed no bruising.

The social worker also spoke with mother and father. Both mother and father reiterated what they previously had said regarding son's ear and other markings. They stated Dr. Chan and the hospital had diagnosed son with a left ear hemangioma and were told it would disappear or get smaller over time. Neither knew why son had bruising, but believed it was possible mother had held son too tightly while bathing him. Father thought some of the bruising might have occurred while son was hospitalized in October. Mother and father denied any abuse of son and explained they had sought timely medical attention for son and followed the doctors' instructions. Both wanted son back home in their care as soon as possible. Mother and father had enrolled in parenting classes.

The social worker followed up with the hospital on the juvenile court's October 2020 order that son be tested for a hemangioma. The hospital responded: "Skin hemangiomas (birthmarks) are typically based on clinical diagnosis with no additional specific studies required. Evaluating [son's] clinical course since presentation, his ear findings are consistent with a resolving hematoma, with no current evidence of a hemangioma."

The social worker also communicated with child abuse pediatrician Dr. Catherine DeRidder, requesting her opinion on the case. The social worker sent to Dr. DeRidder medical reports from the hospitals and doctors who had evaluated son. The following day, Dr. DeRidder responded by e-mail, stating she had reviewed the documents and believed " 'the PMD physician may just have not known what was going on with the ear and thought that a hemangioma was one possibility but it seems with the continued bruising and negative work-up for bleeding disorders, that physical abuse is highly likely in this case.' " Dr. DeRidder

also stated son " 'does have so many bruises which is the most common finding in physical abuse.' "

The social worker communicated with a sheriff's detective who had interviewed mother and father. The detective stated he did "not have concern as to physical abuse" and was "waiting for the Department's investigation outcome."

In addition, the social worker spoke with Dr. Chan, who explained the difference between a hemangioma and a hematoma. Dr. Chan stated "hemangioma is the accumulation of blood vessels before . . . birth" while hematoma "is the accumulation of blood vessel in a certain area of [the] body due to trauma from outside." Dr. Chan noted although hemangioma could happen on different parts of the body, it does not cause the body to bruise more easily. She explained bruises from hemangioma last longer than bruises caused by an outside force or trauma, stating hemangioma bruises "would last for several weeks or 1–2 months."

In late December 2020, the Department filed a last minute report with the court indicating mother and father had completed their parenting education program and had continued monitored visits with son without incident. It was reported mother and father "took care of [son] appropriately during the visits. They fed him, changed his diaper, and played with him. There were no concerns reported." In a later report for the court, however, the Department explained the parenting program parents completed did not address the needs of children son's age but rather taught parenting skills relevant to older children. The Department asked the juvenile court to order parents to complete a 52-week parenting education program that addressed caring for a young infant.

11

In that same report, the Department also noted mother and father often expressed their desire to have son back in their care. They did not know how he got the bruises but they insisted they never abused him. The Department believed "parents need to learn positive stress and anger management focusing on healthy ways to cope with stress and anger on why [son] was detained from their care, and how this affects them in providing a safe care for [son]. The parents' stress and anger management remains a concern for [the Department]." The Department asked the court to order mother and father to participate in individual counseling.

### 4. Expert Reports

Prior to the adjudication hearing, the parties submitted expert reports for the court.

#### a. *Dr. Karen Imagawa and Amara McHale, FNP-C*.

The Department submitted a report by Dr. Karen Imagawa and Amara McHale, FNP-C. This report summarized son's September and October 2020 hospitalizations, related medical records, and postdischarge follow-up appointments. The report concluded: "Based on [son's] clinical findings, the extensive (non-revealing) work-up performed, the progression to complete resolution of the previously noted concerning findings . . . , and no recurrence of any of the concerning findings since placement, it appears that: [¶] – The ear findings were a traumatic ear hematoma, which subsequently resolved. The left cheek bruise also resolved. [¶] – The axillary [armpit] discoloration and masses were bruises with underlying hematomas, which subsequently resolved. [¶] – [Son] also sustained bruising to his trunk, which also progressively resolved."

12

The report also noted that "bruising should not occur with routine daily handling of an otherwise healthy infant (such as [son]), and the reported hypothesized cause of the trunk bruising raised by mother does not appear to be an adequate explanation particularly since she notes that the incident was a 'regular' bath and not an incident during which something occurred in which she would have grabbed [son] differently/harder than usual. Unexplained bruising/injuries in a young infant such as [son] is compatible with non-accidental/inflicted trauma as it is unlikely to occur in an infant of [son's] developmental level who at that time was not yet rolling, crawling, pulling to stand or cruising." The report explained it was difficult to determine the precise date of son's injuries based on the color of his bruises but, "[a]t this time, based on the available information, non-accidental/inflicted trauma remains a concern and the current leading diagnosis."

### b. *Dr. Frederic Bruhn*

Father submitted a report prepared by Dr. Frederic Bruhn. Dr. Bruhn was "convinced that no substantial evidence exists that demonstrates inflicted physical abuse by the parents of [son]." Dr. Bruhn believed "the current situation has arisen because of a faulty assessment of the child, perhaps due to a language barrier existing in this case and/or by a misrepresentation and miscommunication of the actual medical records to the Court."

As to the marks first noted on son's left ear and armpits, Dr. Bruhn opined, "The left ear finding was most likely a subcutaneous hemangioma as evidenced by the finding of a complex cystic malformation anterior to the left ear by ultrasound examination" and "ultrasound revealed increased vascularity under [the armpit] lesions suggesting bilateral

13

hemangiomas." As to the later bruising on son's torso, Dr. Bruhn stated he reviewed color photos provided to him (which were "not identified as to time and person") and "could not identify any significant bruising." He noted a "significant discrepancy" between a report to the court stating bruises on son's torso were three to four inches in size and the admitting physician's report stating those bruises were three to four centimeters. Dr. Bruhn was concerned these bruises "may have represented another underlying deep hemangioma, rather than a bruise."

Dr. Bruhn stressed that "multiple studies found no evidence of other abusive injuries (e.g., no fractures, central nervous system bleeds or retinal hemorrhages)" and that the Department had noted mother and father "did not seem to have many of the usual characteristics of child abusers." He believed "close follow up will probably reveal the underlying diagnosis." He "strongly doubt[ed] that the etiology is inflicted trauma" and "strongly suggest[ed] that a Geneticist at [the hospital] be consulted to rule out whether this child has one of the many deep vascular hemangiomas that are not described."

**5.      Adjudication and Disposition Hearings**

The adjudication hearing was held over the course of three days in January 2021, with the disposition hearing also taking place on the third day. Among other exhibits, the juvenile court admitted the two expert reports described above, over 700 pages of hospital records related to son, as well as medical records from son's first emergency room visit and his pediatrician's office.

The juvenile court heard testimony from Dr. Imagawa and Dr. Bruhn, both of whom were qualified to testify as experts in pediatric child abuse. Mother also testified.

14

### a. *Dr. Imagawa's Testimony*

Dr. Imagawa testified son initially had marks or discoloration on his head (ear and face) and under his arms, then subsequently also on his torso. She stated that, after son's first hospitalization in September 2020, he was discharged with "a diagnosis of a hematoma of the left ear that was resolving and had significantly resolved during the hospitalization." As to son's October 2020 hospitalization, Dr. Imagawa testified son "shouldn't be bruising from just getting a bath or holding him when he's taking a bath." She noted son's "bruises resolved within seven to ten days after he was in placement. And he has had no further bruising as far as I am aware, no further lesions, no further ear injury, nothing under his arms. And we have all of this to document that everything was resolved."

Dr. Imagawa opined, "with reasonable certainty," son had "a hematoma not hemangioma." Dr. Imagawa explained there are no specific tests that can be conducted to diagnose either a hematoma or hemangioma. Rather, she explained, such diagnoses are done by clinical evaluation and a patient's history. She testified son's "clinical course is not consistent with hemangioma" but rather was consistent with a hematoma. She stated there was "no accidental explanation to have caused [son's] ear injury, the bruise on his cheek, the swelling of the temple region, the injuries under his arms." Dr. Imagawa noted because son was an infant and not yet mobile, it was "highly concerning for child abuse" to see marks on such areas of the body. She concluded "these are consistent with inflicted injuries."

Dr. Imagawa also discussed what she considered deficiencies in Dr. Bruhn's report. She stated it appeared Dr. Bruhn did not have access to all of son's medical records and

15

related photographs. In addition, Dr. Imagawa believed some of Dr. Bruhn's conclusions were inaccurate. For example, she testified Dr. Bruhn's conclusion that the doctors "could not agree on a unifying diagnosis 'hemangioma' versus 'hematoma' [was] actually not correct. In the records, it indicates this is a hematoma. And in the discharge summary, it acknowledges that the hematoma had really significantly resolved" and there remained a "residual hemangioma." Dr. Imagawa also noted Dr. Bruhn seemed to emphasize an opinion by a doctor who assessed son during his September 2020 hospitalization, which opinion stated, " 'as of now' " nonaccidental trauma " 'ruled out.' " Dr. Imagawa explained, however, that opinion predated the significant improvement to son's ear at discharge from the hospital and its subsequent total resolution.

### b. *Dr. Bruhn's Testimony*

Dr. Bruhn testified that "there are certain characteristics of abusive parents" that he considers important but not determinative. He stated mother and father did not "fit the usual mold of abusing parents." For example, Dr. Bruhn testified mother "wasn't trying to hide anything from the doctors," noting mother brought son to the doctor when she noticed the lesion on his ear getting worse.

Concerning son's first hospitalization in September 2020, Dr. Bruhn noted one doctor had indicated son might have a "vascular anomaly." In light of that potentiality, Dr. Bruhn stated a vascular anomaly team should have been consulted but was not. He believed the vascular anomaly team, had they been consulted, "would have been able to give a reasonable opinion whether this was a hemangioma or a hematoma [on son's ear]. I think they could have weighed in on that aspect of the diagnosis."

16

Dr. Bruhn also noted there are " 'mimics of child abuse' that are really medical conditions and haven't been adequately ruled out in this situation." He mentioned Ehler-Danlos Syndrome and certain dermatologic conditions as examples. He stated a test exists to rule out Ehler-Danlos Syndrome but it had not been done in this case. Dr. Bruhn was not aware of any tests performed on son during his October 2020 hospitalization that would have ruled out hemangioma. He reiterated he would have consulted with a geneticist and a vascular anomaly team.

Dr. Bruhn emphasized this was a complicated case; "I can't tell you what this is. I don't know, but I know it's not a straightforward NAT [nonaccidental trauma] case." Dr. Bruhn believed son's ear and armpit markings could be hemangiomas but the markings on son's torso were "more likely a bruise." During his testimony, the court asked Dr. Bruhn to review a November 2020 photograph of son's ear. It was unclear whether Dr. Bruhn had seen the photograph before. After looking at the photograph, Dr. Bruhn noted the discoloration of the ear had disappeared and there were two nodules on the upper portion of the ear. Because the discoloration had disappeared, Dr. Bruhn stated the photograph was "a point in favor of this being a hematoma rather than a hemangioma." The court also asked Dr. Bruhn to compare a September 2020 photograph of son's armpits with a November 2020 photograph of the same area. It appeared the marks there had disappeared. Dr. Bruhn stated a hemangioma would "probably not" resolve in that amount of time but a hematoma "definitely would." Similarly, Dr. Bruhn testified, "If it resolved in a short period of time, that would be more in favor of a hematoma." Still, he could not rule out a

17

hemangioma, noting if a hemangioma were deeper under the skin it could be difficult to see.

c. ***Mother's Testimony***

Mother recounted son's multiple hospital visits and various doctors' appointments. She explained she followed the doctors' instructions and always brought son in for his scheduled appointments and sought out medical care even when not scheduled. Mother testified neither she nor father intentionally or accidentally hurt son. Speaking through tears, mother stated, "I want to state this solemnly to everybody who is listening, all the attorneys and Your Honor, that me and my husband really love [son], and we are innocent. We want [son] back. [Son] needs us and we need [son]."

As to son's October 2020 hospitalization, mother testified she did not know why son had markings on his torso but "the doctor kept insisting that I must give an explanation as to what gave rise to [son's] bruises. . . . After some time—they kept pressuring me—I surmised that—I guessed that maybe during a shower, I could have applied just a bit too much pressure on him, that that could cause the bruising. But I don't know." Mother testified some of the Department social workers who spoke with her at the hospital did not speak Mandarin. Mother explained the social workers used a translator through their iPad to communicate with her. Mother believed "the interpretation provided that day was not up to standard" and indicated the social workers also complained about it.

d. ***Ruling***

On January 11, 2021, after hearing the testimony and argument from counsel, the juvenile court sustained the subdivision (a) and first subdivision (b) counts of the petition

18

(related to nonaccidental trauma). The court dismissed the remaining subdivision (b) count (related to medical neglect). The court found son was a person described by section 300.

The court stated, "The fundamental issue before this court is whether the discoloration of [son's] ear, armpits, and abdomen were a result of a congenital hemangioma or a hematoma resulting from inflicted trauma." The court concluded the marks on son's body were "more likely than not" hematomas. In coming to its conclusion, the court "found Dr. Imagawa's opinion to be more cogent, persuasive, and directly supported by the factual circumstances of this case. Dr. Bruhn's opinion was more speculative and, upon further questioning at court, did not hold up as plausible." The court considered Dr. Bruhn's opinion "less plausible than Dr. Imagawa's because his testimony was inconsistent with statements in his report. In court he testified that [son's] abdominal discolorations were likely hematoma and concluded that perhaps even the ear was a hematoma, as well, once he reviewed the photos showing the bruises' resolution after a couple of weeks." The court noted both experts agreed on the differences between hematomas and hemangiomas, that hematomas result from trauma, and that hematomas resolve within weeks whereas hemangiomas take months or longer to resolve.

The court noted Dr. Bruhn "spent much of his testimony speculating about possible other causes for [son's] ear injury, specifically stating that genetic testing would assist in determining whether [son] has Ehler-Danlos . . . Syndrome, which could cause a child to be predisposed to bruising; however . . . Dr. Bruhn stated that Ehler-Danlos Syndrome is a permanent condition and would continue to cause bruising throughout the

19

inflicted child's life. But that situation doesn't match the facts before us here. [Son's] bruising resolved in a couple of weeks, and no further bruising has appeared since he was removed from his parents' care."

Next, the court concluded the hematomas were caused by nonaccidental trauma. Although the court "found mother to be an attentive and loving parent" and "appropriately emotional about having her child removed from her care," the court found it significant mother had failed to provide a reasonable or credible explanation for son's injuries. The court stated, "Despite mother's attentiveness to [son], the evidence shows that the child was seriously injured in her care; therefore, in light of [son's] repeated occurrences of unexplained bruising and the absence of any plausible medical or other explanation about how these injuries occurred, the court can reach no other conclusion than that the parents are responsible for the injuries sustained by [son] while he was in their care."

As to disposition, the juvenile court removed son from parents' custody and ordered, among other things, parents to participate in an age-appropriate parenting class as well as to continue with their monitored visitation. The court emphasized its ruling was not punitive against parents but was in son's best interest. The court also ordered the Department to have son tested for Ehler-Danlos Syndrome.

6.     **Appeal**

Mother and father appealed the juvenile court's January 11, 2021 jurisdictional and dispositional orders.

7.     **Postappeal Orders**

While these appeals were pending, the juvenile court returned son to his parents' custody. As a result, the Department

filed, and we granted, a motion to dismiss the appeals as to the juvenile court's removal order. Also while these appeals were pending, mother and father completed their court-ordered parenting program. Thus, the parents' challenges to the juvenile court's dispositional orders are moot, and we do not address them here.

## DISCUSSION

Mother and father argue substantial evidence does not support the juvenile court's exercise of jurisdiction under subdivision (a). As discussed below, although we agree this is not a straightforward case, we are not persuaded by the parents' arguments and conclude substantial evidence supports the juvenile court's jurisdictional findings.

### 1. Applicable Law

Under section 300, subdivision (a), the juvenile court may assert dependency jurisdiction and declare a child a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm. For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." (§ 300, subd. (a).)

21

Section 355.1, subdivision (a) creates a rebuttable presumption that certain injuries are nonaccidental in nature. That section provides, "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a).) "Once the petitioner establishes a prima facie case under section 355.1 the burden of producing evidence 'shifts to the parents the obligation of raising an issue *as to the actual cause of the injury* or the fitness of the home.' [Citation.] 'The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' (Evid. Code, § 604.)" (*In re D.P.* (2014) 225 Cal.App.4th 898, 903–904; § 355.1, subd. (c).)

Thus, "[w]hile the presumption under section 355.1 'disappears upon the introduction of evidence which would support a finding of its nonexistence (Evid. Code, § 604), the trier of fact, here the juvenile court, must still weigh the inferences arising from the [professional's] testimony which gave rise to the presumption against the contrary evidence . . . and resolve the conflict. [Citation.]' [Citation.] . . . 'Where there is more than one inference which can reasonably be deduced from the facts,

the appellate court is without power to substitute its deductions for those of the trier of fact.' " (*In re D.P.*, *supra*, 225 Cal.App.4th at pp. 904–905.)

"The legislatively declared purpose of these provisions [of the Welfare and Institutions Code] 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) Courts "need not wait for disaster to strike before asserting jurisdiction." (*In re K.B.* (2021) 59 Cal.App.5th 593, 603.) Moreover, special protection is given to children like son, who are " 'of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] physical health and safety.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216, 1219 [children under the age of six at the time of the jurisdiction hearing are of "tender years"].)

## 2.    **Standard of Review**

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re I.C.* (2018) 4 Cal.5th 869, 892.) "It is well settled that the standard is not satisfied simply by pointing to ' "isolated evidence torn from the context of the whole record." ' [Citations.] Rather, the evidence supporting the jurisdictional finding must be considered " 'in the light of the *whole record*' " 'to determine whether it discloses substantial evidence—that is,

23

evidence which is reasonable, credible, and of solid value.' " (*Ibid.*)

" ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Under this standard, our review " 'begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact.' " (*In re David H.* (2008) 165 Cal.App.4th 1626, 1633.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. [Citation.] The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

3.     **Justiciability**

As an initial matter, we note mother and father challenge only the juvenile court's exercise of jurisdiction under subdivision (a). Mother and father do not challenge the juvenile court's exercise of jurisdiction under subdivision (b). Thus, even if we were to reverse the juvenile court's subdivision (a) finding, dependency jurisdiction would remain under subdivision (b). In

such circumstances, an appeal is subject to dismissal as nonjusticiable. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763.) Nonetheless, in such cases an appellate court may address the merits of the challenged jurisdictional finding when "the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction.'" (*Ibid.*)

Mother and father urge us to consider their appeal because the juvenile court's subdivision (a) finding could harm them beyond jurisdiction.[3] The Department does not argue otherwise or even address this issue on appeal. We elect to consider the parents' challenge to the juvenile court's exercise of jurisdiction under subdivision (a). (*In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 762–763; *In re D.P.*, *supra*, 225 Cal.App.4th at p. 902.)

## 4. Substantial evidence supports jurisdiction under section 300, subdivision (a) (physical abuse).

Mother and father argue they presented sufficient evidence to rebut the section 355.1 presumption. In particular, they claim Dr. Bruhn's testimony rebutted the section 355.1 presumption that son's injuries were nonaccidental and caused by the parents. Parents note Dr. Bruhn "testified that the cause of the marks could be caused by a vascular anomaly or a genetic disease." In

---

[3] Mother and father also urge us to consider their appeal of the juvenile court's subdivision (a) jurisdictional finding because that finding served as a basis for the court's dispositional orders, which the parents also appealed. However, as noted above, the appeals from the dispositional orders are now moot and, therefore, do not constitute grounds for considering their subdivision (a) jurisdictional challenge.

fact, Dr. Bruhn was not sure what caused the markings on son's body. He testified, "I can't tell you what this is. I don't know, but I know it's not a straightforward NAT case." Assuming this was sufficient to rebut the section 355.1 presumption, the juvenile court then was required to weigh the conflicting evidence and make factual determinations. (*In re D.P.*, *supra*, 225 Cal.App.4th at pp. 904–905.)

We conclude substantial evidence supports the juvenile court's jurisdictional findings. On the one hand, the evidence included the parents' apparent love and concern for son, their emphatic denials of intentional harm to son, mother's suggestion that some of son's bruising could have resulted from her innocently holding him too tightly during bath time, and Dr. Bruhn's expert speculation that a variety of genetic or dermatologic conditions could have caused son's markings. On the other hand, the evidence also included Dr. Imagawa's expert opinion, as well as other medical doctors' opinions, that son's repeated presentations with unexplained markings were highly indicative of physical abuse. Given the fact that no one could definitively state how or why son had the markings he had, which importantly by all accounts appear to have been hematomas as opposed to hemangiomas, and son clearly was of "tender years," the juvenile court's subdivision (a) finding was supported by substantial evidence.

We are not persuaded by the parents' attempt to minimize the visible markings on son's body. Parents argue the markings on son's body do not constitute "serious physical harm" under subdivision (a). We disagree. When an infant has visible swelling and obvious bruising on multiple areas of his body on more than one occasion, regardless of whether that infant

26

appears to be in pain when those areas are examined, those injuries certainly can constitute serious physical harm for purposes of subdivision (a). While we agree with parents that any unexplained bruise on a child does not necessarily constitute cause for dependency jurisdiction, this case presents more than a single unexplained bruise. Additionally, Dr. Imagawa reported a healthy infant such as son would not sustain bruising from routine daily handling. Yet here, son, an infant, had repeated unexplained markings which multiple doctors considered highly concerning for child abuse.

As Dr. Bruhn noted, this is not a straightforward case. There are clearly two conflicting sides to the matter. Nonetheless, we cannot reweigh the facts or assess credibility of witnesses. Those are roles explicitly reserved to the juvenile court. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; *In re David H.*, *supra*, 165 Cal.App.4th at p. 1633; *In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.) Significantly, of the two expert opinions presented, the juvenile court found Dr. Imagawa's opinion more plausible. The court found Dr. Bruhn's opinion "more speculative and, upon further questioning at court, [it] did not hold up as plausible." Despite the competing evidence, substantial evidence supports the juvenile court's jurisdictional findings under subdivision (a).

Finally, after briefing had concluded in this appeal, counsel for mother filed a letter alerting the court of new case authority, *In re Cole L.* (2021) 70 Cal.App.5th 591 (*Cole L.*), which our colleagues in Division Seven of the Second District recently decided. Mother argues *Cole L.* supports the parents' position here that the juvenile court's subdivision (a) jurisdictional finding must be reversed. However, *Cole L.* is factually distinguishable

27

from the instant case. In part, the *Cole L.* court reversed a finding of dependency jurisdiction under subdivision (a) based on incidents of parental domestic violence outside the presence of the subject children. (*Id.* at pp. 602–603.) The court also stated that "a finding under section 300, subdivision (a), requires evidence of a risk of physical injury 'inflicted nonaccidentally upon the child.' An unintended injury to a bystander child that results from an intentional act directed at another—for example, due to an object thrown by one parent at another during an argument—does not satisfy that statutory requirement." (*Cole L.*, *supra*, at p. 603.) *Cole L.* is factually distinct and does not change our decision here.

## DISPOSITION

The juvenile court's January 11, 2021 jurisdictional order is affirmed and the remaining appeal from the juvenile court's dispositional order is dismissed as moot.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

HOFFSTADT, J.

28